**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| QUINTON M. THOMAS and BRADLEY JILES, | ) ) ) |
| | ) Case No. 18-cv-2071 |
| Plaintiffs, | ) |
| | ) |
| v. | ) (Jury Trial Demanded) |
| | ) |
| CITY OF EDMUNDSON, | ) |
| | ) |
| Defendant. | ) |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.    The City of Edmundson, through its police department, municipal court system, and prosecuting attorney's office, has terrorized the named Plaintiffs and many thousands of others through a deliberate policy established and implemented to fill the city's coffers by extorting money from thousands of poor, disproportionately African-American people in the St. Louis region, creating a modern-day police state and debtors' prison scheme that has no place in American society.

2.    The scheme reflects an extraordinary abuse of governmental authority, starting with the over-policing of low-income communities of color and the issuance of excessive citations for traffic and other minor municipal code violations, followed by arbitrary fines, penalties, surcharges, and interest charges that pile up like debts to a loan-shark, arrest warrants auto-generated without good cause or even a semblance of due process, and imprisonment—imposed without assistance of counsel—in squalid debtors' prisons.  This unconstitutional revenue-

generation scheme disproportionately targets African-American residents, placing jobs at risk, leaving children without supervision, and debasing fundamental human rights, for as long as it takes to strong-arm payment from Plaintiffs and others.

3.     Plaintiffs are a group of similarly situated individuals who are victims of this predatory scheme.  Each of these human beings was locked in a cell solely because he or she was unable to afford a cash payment.  And each was left to languish in filthy, often overcrowded jail cells because he or she could not afford to pay jacked-up fines, penalties, and other charges. Defendant did not inquire about, much less accommodate, the hardships its extortionate demands placed on Plaintiffs and their families.  Nor did Defendant offer to provide Plaintiffs with counsel who could advise them of their rights or otherwise protect them from this predatory scheme.[1]

4.     Edmundson officials and employees—through their conduct, decisions, training, rules, policies, practices, and procedures—constructed and implemented this scheme for the overriding purpose of raising municipal revenue (and not for any legitimate law enforcement purpose).

5.     Defendant gained the coercive leverage to effectuate this scheme by resurrecting a modern analogue of debtors' prisons—an institution this country rejected as inhumane more than a century ago.  That leverage has made the scheme increasingly profitable.  Edmundson's law enforcement and municipal court practices focus on maximizing revenue, rather than promoting public safety, administering justice, or providing the bare rudiments of due process.  Defendant

---

[1] The architecture of this illegal scheme has been in place for many years.  *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 88 (1966) ("[I]t seems that many citizens of the state are being confined needlessly in our city jails . . . ."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id.* at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability. . . .").

has forced the poorest and most vulnerable citizens to finance a municipal system that is a tool of injustice and oppression.

6.      As a result, this scheme has targeted and persecuted people who live in or travel through Edmundson and its neighboring municipalities' borders, trapping people for years in a cycle of escalating fees, intractable debt, and imprisonment.  In particular, Defendant has preyed on the most vulnerable, those living in or near poverty, who are least able to bear, or to avoid, the extortionate costs this system has imposed.

7.      Thousands of people in the Plaintiffs' position were forced to divert funds from their disability checks, or sacrifice meager earnings their families desperately need for food, diapers, clothing, rent, and utilities, to pay spiraling court fines, fees, costs, and surcharges. Whether or not valid, a citation for a minor offense—a broken tail light, a lane change without signaling—often generates crippling debts for people like Plaintiffs, which resulted in jail time when they could not afford to pay, deepening their already desperate poverty.

8.      The summary imprisonment imposed on people who have appeared in the municipal courts of Edmundson and its neighboring municipalities but who could not afford to pay the sums of money demanded has frightened many away from the courthouse, allowing Defendant to jack up the fines even further and issue arrest warrants—intended to coerce payment—for "Failure to Pay" and "Failure to Appear."  Month after month, year after year, the cycle has repeated itself, ensnaring Plaintiffs and those like them in a system from which it has been nearly impossible to extricate themselves.

9.      Defendant has abused the legal system to bestow a patina of legitimacy on what is, in reality, extortion.  If private parties had created and implemented this scheme, enforced it by threatening and imposing indefinite incarceration, and milked poor families of millions of dollars,

the law would punish them as extortionists and racketeers, and the community would take steps to prevent them from exploiting the most vulnerable of its members.  These predatory practices are no more legitimate—and indeed are more outrageous—when state and local government actors perpetrate them under color of law.

10.     The treatment of the named Plaintiffs reveals a coordinated, systemic effort to deprive some of the area's poorest residents of their rights under the United States Constitution. For years, Defendant has engaged in the same conduct, as a matter of policy and practice, against Plaintiffs and thousands of other impoverished citizens.   These citizens' fundamental constitutional right to liberty, however, does not depend on their income.  Defendant has created or revived a *de facto* debtors' prison, using it as a tool to cow poor people into financing municipal government.  Such flagrant abuse is not consistent with the values this country holds dear, with the rule of law, or with the constitutional guarantee of due process. [2]

11.     On its own, the City of Edmundson lacks the capacity to hold more than a few people at a given time, so it contracted with its neighboring municipality, the City of St. Ann, to arrest a significantly greater number of people for alleged municipal ordinance violations and ship them to St. Ann Jail, where arrestees languished until the Defendant could extract enough money from the individuals or their families to satisfy the Municipality's demands.  Without the availability of St. Ann's recently-expanded jail, which "sleeps 42, not including a pen for short-

---

[2] Plaintiffs originally named twelve of these municipalities—St. Ann, Normandy, Cool Valley, Velda City, Beverly Hills, Pagedale, Calverton Park, St. John, Bel-Ridge, Wellston, Velda Village Hills, and Bellefontaine Neighbors—as defendants in a single lawsuit along with the City of Edmundson.  *See Quinton Thomas, et al. v. City of St. Ann, et al.*, No. 16 CV 1302 (RWS) (E.D. Mo.).  On April 24, 2017, the *Thomas* court dismissed without prejudice as being improperly joined all defendant municipalities except for St. Ann.  Plaintiffs now bring this action solely against the City of Edmundson.

timers and a juvenile area,"[3] the Defendant would not have been able to incarcerate, or threaten to incarcerate, human beings too poor to pay their debts.

12.     Plaintiffs, by and through their attorneys, and on behalf of those similarly situated, bring this civil action pursuant to 42 U.S.C. § 1983 and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the abuse that Defendant has rained down on them, injunctive relief assuring that Defendant will not violate their rights again, and a declaration that the Defendant's conduct is unlawful.[4]

## NATURE OF THE ACTION

13.     Pursuant to policy and practice, Defendant has jailed people who could not afford to pay money they supposedly owed Defendant or neighboring municipalities for traffic tickets and other minor alleged municipal code violations.  Defendant has jailed people for nonpayment without inquiring whether they *can* pay, without considering alternatives to imprisonment as required by federal and Missouri law, and without setting bail and/or bond based on the person's individual circumstances.

14.     Pursuant to policy and practice, Defendant has jailed indigent people for these alleged debts without informing them of their right to counsel and without providing counsel for those who cannot afford it.

---

[3] Bogan, Jesse, *A Sense of Change in St. Ann*, ST. LOUIS POST-DISPATCH (Aug. 5, 2012), http://www.stltoday.com/news/local/metro/a-sense-of-change-in-st-ann/article_c2dd4c0b-45fc-552f-8df9-8ec5db29d7cb.html.

[4] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement, and on information and belief as to all other matters.

15.     Pursuant to common practice, Defendant has arbitrarily and incrementally set and re-set the amount of money it requires indigent people to pay for release throughout their indefinite detention, sometimes eventually releasing the person if Defendant determines it cannot extort money from him or her.

16.     Pursuant to policy and practice, Defendant has incarcerated individuals indefinitely, unless and until the person, or the person's family or friends, could pay sufficient money to satisfy Defendant.  The conditions of incarceration were so miserable as to intensify the coercive effect.

17.     Pursuant to policy and practice, Defendant has issued and enforced invalid arrest warrants, threatened alleged debtors with jail if they do not bring cash to court, held alleged debtors in jail for a week or more without any judicial appearance, and, without due process, set and modified monetary payments necessary for release with no regard for ability to pay or basic fairness.  These tactics frighten people away from appearing in court and then punish them for not appearing.

18.     These policies and practices are further reflected in, and caused by, Defendant's (1) failure to establish consistent procedures, effective training, and meaningful supervision to appropriately guide and monitor the actions of law enforcement officers and other agents of Defendant engaged in law enforcement and municipal court activities; (2) failure to establish reliable systems to detect and appropriately discipline and hold accountable municipal officials for misconduct; and (3) prioritizing revenue generation at the expense of legitimate public safety needs and the rights of thousands of St. Louis County residents.

19.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

## JURISDICTION AND VENUE

20.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq*., and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

22.     Plaintiff Quinton M. Thomas is a 30-year-old man.

23.     Plaintiff Bradley Jiles is a 26-year old man.

24.     Defendant City of Edmundson is a municipal corporation, organized under the laws of the State of Missouri.  The City of Edmundson operates the Edmundson Municipal Court and Edmundson Police Department, and has contracted with the City of St. Ann to imprison individuals in the St. Ann Jail.

## FACTUAL ALLEGATIONS

### A.     Factual Background

25.     St. Louis County, Missouri is comprised of 90 municipalities and 81 separate municipal courts.  These municipalities range in population from under 100 people to over 10,000. The population of the City of Edmundson is estimated to be 832.

26.     In 2013, the municipal courts of St. Louis City and County collected $61,152,087 in fines and fees.  During that same time, the combined total of court fines and fees collected by Missouri municipal courts was $132,032,351.63.  This means that the municipal courts in the St. Louis region accounted for 46% of all fines and fees collected statewide, despite being home to only 22% of Missourians.[5]

---

[5] *See* Better Together's *Municipal Courts Study*, *available at*
http://www.bettertogetherstl.com/studies/public-safety/municipal-courts-report.

27.     In recent years, there has been little to no oversight of the St. Louis region's municipal courts.  A judicial circuit in Missouri contains on average 8.6 municipal court divisions.  The St. Louis County judicial circuit contains 81 municipal court divisions.  As a result, the presiding judge of St. Louis County's circuit courts must oversee nearly ten times the number of municipal courts and municipal court judges as an average presiding judge in Missouri.[6]

28.     In 2013, Edmundson received 34.86% of its general revenue from fines and fees.[7]

29.     Based on data reported by police departments to the Missouri Attorney General, black residents in Edmundson are much more likely to be searched and/or arrested as a result of a vehicle stop.[8]  For example, in 2015, in Edmundson, out of 1,267 total vehicle stops, 1.59% of stops of white individuals resulted in a search, whereas 5.73% of stops of black individuals resulted in a search.  While contraband is equally likely to be discovered during stops involving both white drivers and black drivers, black drivers are nearly three times more likely to be arrested than white drivers as a result.[9]

## B.     Defendant Has Operated Its Municipal Court as a Profit Center

30.     Defendant has improperly used its municipal court as a profit center rather than a dispenser of justice.[10]  Between 2012 and 2016, Defendant reaped over $2.2 million in revenue from its municipal court.[11]

---

[6] *Id.*

[7] *Id.*

[8] MISSOURI ATTORNEY GENERAL VEHICLE STOPS REPORT, *available at* https://ago.mo.gov/home/vehicle-stops-report/advanced-search.

[9] John Eligon, *Missouri Reports Wide Racial Disparity in Traffic Stops*, NEW YORK TIMES (Jun. 1, 2015), https://www.nytimes.com/2015/06/02/us/big-disparity-for-blacks-pulled-over-in-missouri.html.

[10] Unless otherwise stated in this Complaint, the policies, practices, and procedures of Defendant described herein have been in existence for at least the past five years.

[11] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2012, Table 94, http://www.courts.mo.gov/file.jsp?id=58805; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL

31.     Well before each fiscal year, Defendant determines the amount of money it needs its municipal court to generate.  Defendant depends on the money collected through its municipal court to pay municipal court judicial salaries, pay city attorney's office salaries, and fund other portions of its municipal budget.

32.     Defendant has operated its court to maximize revenues at the expense of justice. Defendant has made decisions regarding the operation of the court—including the assessment of fines, fees, costs, and surcharges; the availability and conditions of payment plans; the determination of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the refusal to appoint an attorney for indigent defendants—based on its desire to meet fiscal projections rather than on legitimate penological considerations.

33.     In 2015 alone, Defendant issued 2.4 arrest warrants per adult residing in the City, or 6.4 per household,[12] mostly for minor municipal ordinance violations like traffic tickets.

34.     At least 14 of Defendant's neighboring municipalities have depended on the St. Ann Jail as a jailing hub, thereby expanding significantly those municipalities' capacities to boost municipal revenues by arresting, jailing, and coercing payments from more and more poor residents of the St. Louis region for minor traffic tickets.

---

REPORT SUPP.: FISCAL YEAR 2013, Table 94, http://www.courts.mo.gov/file.jsp?id=68844; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2014, Table 94, http://www.courts.mo.gov/file.jsp?id=83262; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 94, http://www.courts.mo.gov/file.jsp?id=96437; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2016, Table 94, https://www.courts.mo.gov/file.jsp?id=109581.

[12] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 95, http://www.courts.mo.gov/file.jsp?id=96438; U.S. CENSUS BUREAU, PROFILING OF GENERAL POPULATION AND HOUSING CHARACTERISTICS 2010, http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

C.    **Defendant's Unlawful Policies and Practices**

35.    Defendants' unlawful policies and practices start from the top, with the Mayor, who has tracked the number of traffic tickets Edmundson police officers issue and admonished those officers when they do not issue as many tickets as the Mayor would like.  After one brief downturn in the number of tickets written, the Mayor sent a memo to all Edmundson Sergeants and Patrolmen "remind[ing] [them] that the tickets that [they] write do add to the revenue on which the P.D. budget is established and . . . directly affect pay adjustments at budget time."[13]  The Mayor threatened cuts to pay and benefits if officers did not issue more tickets, noting that the police department was "a safe and pleasant work place with good compensation and benefits for everyone" but that the "ability to continue doing this [was] being compromised by [the] work slow down."[14]

36.    Edmundson police officers, following the instructions of the Mayor, have issued an extraordinary number of tickets to individuals in Edmundson for traffic offenses and other minor violations.  In many cases, these violations are "crimes of poverty," meaning that they result, at least in part, from the individual's inability to pay for things like insurance, vehicle registration fees, etc.

37.    In a typical case, the police officer issues the person a citation and informs her that she can either pay the fine or appear at the municipal court at a designated date and time.  In some cases, the person can simply afford to pay the citation and thereby avoid the clutches of the municipal court system.  But many in the St. Louis area are indigent and cannot afford to pay such citations without sacrificing basic necessities like food, diapers, and rent.  For these individuals,

---

[13] Memo from Edmundson Mayor to Edmundson Sergeants and Patrolmen, April 18, 2014, attached as Exhibit 1.
[14] *Id.*

the system works differently—it becomes a Kafkaesque web of indignities and incarceration that plunge the victim ever deeper into poverty.

38.     An indigent person who cannot afford to pay a fine from an alleged traffic offense or other minor violation must appear in a municipal court.  There, she is forced to wait in line—in some cases, for hours—before being called before a municipal judge who will ask whether she has the money to pay, on the spot, the fine *plus* court costs.  The municipal judge does not inquire as to whether the person is indigent or can afford to pay the fine, nor does he offer to provide a lawyer if the person cannot afford one.  Instead, the municipal judge asks a simple question:  do you have the money to pay today, yes or no?  In many cases, the answer is no.

39.     In the many cases in which the individual cannot come up with the requisite funds at the courthouse, Edmundson officials regularly have employed several tactics to coerce payment: (i) in some cases, the municipal judge or other municipal official has instructed the person that she must return to court at a future date and time with the required funds, plus interest, or she will be jailed; (ii) in other cases, the municipal judge or other municipal official instructs the person to see the court clerk to set up a payment plan, which will require the person to pay in installments, subject to exorbitant interest rates, surcharges, and other fees; and (iii) in other cases, the municipal judge or other municipal official has detained the person at the courthouse for the remainder of the court session (if not longer), instructing her to contact friends and family to bring money to the courthouse to secure the person's release.

40.     In all three scenarios, the individual faced the possibility of jail time if she was not able to pay the fine and associated court costs, interest, surcharges, and other fees.  Municipal court officials, including the municipal judges and clerks, regularly have instructed court attendees that failure to pay a fine and other costs will result in jail time.  Indeed, residents of Edmundson

commonly understood that attending a municipal court session without the funds necessary to pay off a citation or other debt could result in jail time, irrespective of whether the individual actually had the ability to pay.  Defendant's tactics have thus frightened many people, including many of the Plaintiffs, away from municipal court dates when those individuals did not have enough money to pay their fines and other debts.  This ultimately enabled Edmundson to squeeze more money from these poor residents.

41.     If an individual missed or was alleged to have missed a court date, the court's computer system automatically generated an arrest warrant for "Failure to Pay" or "Failure to Appear."  According to recent reports from the state auditor's office, no judge or prosecutor reviews or signs these arrest warrants.[15]

42.     Often, the computer system auto-generated an arrest warrant even where (a) the individual did, in fact, attend the court session, but the municipal clerk or other court official erred in recording the person's absence, (b) the individual did not receive adequate notice of the court date, or (c) the individual had a valid excuse for her absence -- *e.g.*, because she was detained by another municipality, had a court date in another municipality, or was ill.

---

[15] See *Summary of Audit Findings Judiciary---Municipal Divisions, Report No. 2016-046*, *available at* http://app.auditor.mo.gov/AuditReports/AudRpt2.aspx?id=60, which states:

> The Municipal Judge did not sign warrants issued and did not issue written authorization for the Court Clerk/Administrator to sign warrants on his behalf. In addition, the Municipal Judge allowed the Court Clerk/Administrator to use his signature stamp on warrants and failure to appear notices. Without the signature or written authorization, there is no documentation the warrants were authorized. In addition, the municipal division did not always issue warrants timely.

> Supreme Court Rule 37.45 states a warrant shall be signed by the judge or by the clerk of the court when directed by the judge for a specific warrant. To ensure warrants are properly issued in accordance with Supreme Court rules, the Municipal Judge should sign warrants or provide specific written authorization for the Court Clerk/Administrator to sign warrants and discontinue allowing the use of his facsimile signature. In addition, warrants should be issued timely to ensure outstanding court appearances and fines are addressed.

43.     Defendant has issued hundreds of arrest warrants for "Failure to Pay" or "Failure to Appear" each year.  These arrest warrants are often pretextual and are simply a mechanism by which Defendant could coerce indigent persons to pay fines and costs that they could not actually afford.

44.     The arrest warrant empowered any municipality to stop and arrest the individual the warrant identified.  Having arrested this person, an officer could take the individual to:  (i) the municipal jail of the municipality in which the person was arrested, (ii) the municipal jail of the municipality that issued the arrest warrant, or, in many cases, (iii) the St. Ann Jail, which contracted with neighboring municipalities to provide jailing services.

45.     Once the individual arrived at the St. Ann Jail, she could secure her release immediately if she was able to pay off her entire debt (including any interest, fees, or other costs).  In some cases, the St. Ann Jail would release the individual if she was able to pay a portion of her debt, taking whatever money the individual had on-hand or could obtain from family and friends.

46.     In almost all cases, an individual arrested for "Failure to Pay" or "Failure to Appear" did not appear before a judge to answer for the alleged crime of failing to attend a court date.  Instead, after her release from the St. Ann Jail, the individual received a new court date at which a municipal judge would ask the same question:  do you have money today to pay your fines, yes or no?  Not just the original fine for the traffic stop, but now multiplied many times over because of the individual's inability to pay and sometimes because the municipality's abusive tactics have scared away Plaintiffs and others from even coming to court.  In this manner, the cycle repeated itself, month after month, year after year.

47.     The practices described in this "typical" example were ubiquitous in Edmundson. As a matter of policy and practice, municipal officials in Edmundson (including judges, police officers, and court clerks, among others) have routinely:

    a.    Issued citations for supposed traffic and municipal code violations (which, on information and belief, are the product of discriminatory enforcement of the law);

    b.    Demanded payment of fines for such traffic and municipal violations, without any inquiry into whether the person has the ability to pay, and without offering to provide a lawyer if the person is indigent and cannot afford one;

    c.    Established draconian payment plans with usurious interest rates and other fees for  indigent persons who cannot afford to pay their fines, and without offering nonmonetary alternatives to satisfy the obligation;

    d.    Threatened people, including the indigent, with incarceration under inhumane conditions if they cannot afford to pay their fines, court costs, and other fees;

    e.    Issued auto-generated arrest warrants for "Failure to Appear," even if the person did in fact appear, was unable to appear for good reason (including lack of notice), or was intimidated by municipal officials into not appearing because of the well-founded fear that they would be summarily thrown into jail if they appeared without being able to pay;

    f.    Denied appointment of counsel for indigent defendants who face incarceration for failing to satisfy a payment plan condition imposed by Defendant;

    g.    Incarcerated people for their inability to pay fines, court costs, and other fees, or on the basis of unlawful, auto-generated arrest warrants for "Failure to Pay" or "Failure to Appear" at a court date;

    h.    Released people from jail immediately if they are able to pay their outstanding debts to Defendant —or, in some cases, a portion of their outstanding debts—even if the purported basis for the arrest was the criminal act of failing to appear at a court date; and

       i.       Detained people in local jails for up to three days, if not longer, if they could not afford to pay their outstanding debts, or at least some portion of such debts.

### i.      Debt-Collection Proceedings in Defendant's Municipal Court

48.    Defendant's municipal court is staffed primarily by its municipal court judge, the city prosecutor, court clerk, and other court staff.

49.    There is extraordinary overlap among the court officials in the St. Louis County municipalities, including Edmundson.  For example, attorneys at a single law firm (with fewer than 20 attorneys) at one point served as judge, prosecutor, or city attorney in more than 27% of St. Louis County municipalities (at least 25 out of 90), including Edmundson. In some instances, the municipal prosecutor for one municipality served as the municipal judge in another.

50.    The purported function of the Edmundson municipal court is to adjudicate traffic violations and other minor offenses; the real purpose, however, is to collect payments, in an assembly-line fashion, for outstanding tickets from alleged traffic and other minor municipal code violations.

51.    If a person is too poor to pay her debts, her case can go on indefinitely, subjecting her to multiple arrests and ever-mounting fees.

52.    A person can end this debt collection process only by paying what Defendant claims that she owes, including any surcharges or fees, which can balloon to sums that dwarf the original fine for the minor traffic offense that launched the vicious cycle.

53.    In many cases, Defendant has not advised people appearing at these municipal court sessions about their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures, nor has Defendant provided people any realistic avenue of escape from the pernicious web in which they are entangled.

54.     In many cases, Defendant, pursuant to policy and practice, has not provided an attorney to people appearing at these municipal court sessions.

55.     In many cases, Defendant, pursuant to policy and practice, has imprisoned those who are unable to satisfy whatever fines and penalties (either in full or as part of a repayment schedule) Defendant has set at these municipal court sessions.  Defendant has done so without providing due process, without conducting any meaningful or individualized inquiry into a person's ability to pay, and without considering the availability or suitability of alternatives to imprisonment.

56.     Because of Defendant's policy and practice of not appointing counsel, the vast majority of those jailed for failing to satisfy the payment plan conditions that Defendant has imposed, or in connection with an arrest warrant for "Failure to Pay" or "Failure to Appear," have had no access to an attorney.

**ii.     Defendant's Flawed and Unlawful Warrant Process**

57.     Pursuant to policy and practice, Defendant has applied arbitrary and illegal policies for the issuance and enforcement of arrest warrants for those unable to satisfy Defendant's extortionate demands.

58.     Defendant has issued arrest warrants for failure to make a payment by a certain date ("Failure to Pay") without probable cause to believe that the person had the ability to make a payment.  Defendant has preyed on the unrepresented, refusing to withdraw arrest warrants even for those who are plainly too poor to make payments.

59.     Defendant has also routinely issued arrest warrants for "Failure to Appear" at court dates without giving people adequate notice of the supposed obligation to appear, such as when

Defendant has failed to serve a valid summons or when Defendant has rescheduled a hearing without providing reasonable notice.

60.     The arrest warrants that Defendant has issued for "Failure to Pay" and "Failure to Appear" at court dates have been auto-generated by a computer program, based on information that the municipal court clerks entered manually into the computer.  No judge or magistrate approved these warrants before they were issued.

61.     After arresting a person based on a warrant, Defendant has routinely demanded that she make immediate payment and, if she has not done so, Defendant has held the person in jail and unnecessarily delayed presentment in court for days or weeks in an effort to coerce the victim to pay for her freedom, regardless of her indigence.

**iii.     The Arbitrary and Indefinite Detention of the Indigent**

62.     After booking a person in jail for either "Failure to Pay" or "Failure to Appear," Defendant has offered immediate release in exchange for a cash payment.  The amount of cash that Defendant has required for release has often been the total debt the person owes from judgments in old traffic and other misdemeanor cases.

63.     Defendant also has jailed people for "Failure to Pay" or "Failure to Appear" warrants that neighboring municipalities issue.

64.     Particularly given Defendant's frequent interactions with these neighboring municipalities and the substantial overlap among these municipalities in personnel involved in the courts, jails, and law enforcement, Defendant knew, or should have known, that these warrants arose from the person's inability to pay a debt owed to the neighboring municipality.

65.     On those occasions that Defendant has jailed people for "Failure to Pay" or "Failure to Appear" warrants issued by neighboring municipalities, Defendant has offered immediate

release in exchange for a cash payment, and the amount of cash that Defendant and the neighboring municipality have required for release has often been the total debt the person owes from judgments in old traffic and other misdemeanor cases.

66.     Pursuant to policy and practice, Defendant has held people in jail, in abject conditions, for an indeterminate period of several days or more unless and until they or their families have paid Defendant or the neighboring municipalities the amounts demanded.

67.     For those individuals imprisoned for failing to satisfy a previously-established payment schedule, Defendant has confiscated any previous amounts paid by the person and reset the person's debts.  Defendant has taken these actions without providing any meaningful process or access to counsel.

68.     Through these practices, Defendant has strong-armed many impoverished people in Edmundson and elsewhere in the metropolitan area to pay Defendant thousands of dollars over a period of many years based on a few relatively inexpensive initial tickets.

69.     If she were able, a person could end this cycle by paying the balance of her debt.  It is and has been the policy and practice of Defendant to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating all existing "cases" for which debt is being collected.

### iv.     Sequential Detentions on Behalf of Multiple Municipalities

70.     In many cases, Plaintiffs and others similarly situated receive citations for traffic and other minor violations in multiple different municipalities (in some cases, for the exact same violation, such as a broken taillight).

71.     Many of the Plaintiffs, and others like them, have outstanding debts in several different municipalities that they simply cannot afford to pay.  As these rapidly compounding fines,

fees, costs, and surcharges from multiple municipalities pile up, the likelihood that an indigent person will be able to pay off even one municipality diminishes greatly, creating a never-ending spiral of debt, interest charges, missed payments, and incarceration.

72.    Pursuant to policy and practice, inmates have been held in jail on behalf of multiple municipalities.  In some instances, people have been imprisoned for days or weeks at a time on behalf of multiple municipalities in a sequential fashion.

73.    In other words, as soon as an inmate has paid off his debt for one municipality to secure his "release," he was returned to his jail cell for the alleged failure to pay debts owed to another municipality.

74.    In this manner, an inmate was held in jail for an extended period of time—weeks or, in some cases, even months—simply because he was too poor to pay off his debts, with his imprisonment only exacerbating his poverty, making him even less able to break out of this vicious cycle of harassment and extortion.

v.    **Defendant Creates a Culture of Fear**

75.    Defendant's policies and practices, as well as those of neighboring municipalities, have engendered fear among the poorest residents of the St. Louis metropolitan area.

76.    Many of these residents do not, or are reluctant to, leave their homes, or to travel between municipalities, for fear of being stopped, arrested, and incarcerated based on outstanding debts on traffic tickets that they cannot afford to pay.

77.    They are afraid to appear at the payment window or in the courts of Defendant and nearby municipalities to explain their indigence because they justifiably fear that Defendant will jail them without any meaningful process.  This allows Defendant and other municipalities to jack up the fees even higher.

78.     The fear that Defendant has fostered has further degraded the quality of life of the poorest residents in Edmundson and elsewhere in the metropolitan area.  Many have cut back on food, clothing, utilities, sanitary home repairs, and other basic necessities of life to satisfy, or try to satisfy, Defendant's rapacious demands for money.

### vi.     The Cycle of Debt and Jailing

79.     Like the other impoverished people stuck in this brutal and pernicious system, Plaintiffs have been overwhelmed by the combination of rapidly compounding fines, fees, costs, and surcharges from multiple municipalities, as well as the cycle of repeated jailings that leads to lost jobs, poor health, and inadequate care for dependents.  After scraping together cash from family and friends and borrowing money to pay off one municipality, Plaintiffs and other Class members often found themselves under arrest by or on behalf of another municipality.

80.     For years, Plaintiffs have tried unsuccessfully to navigate this system without financial resources and without the assistance of a lawyer who understands the process—never knowing if arrest awaits when they leave the house, fearing, if they are arrested, indefinite incarceration because of their poverty.  The futility of these efforts fundamentally alters Plaintiffs' lives and often breeds a level of hopelessness that corrodes any bond with the community.

81.     The fear of losing basic rights with no recourse is a daily fact of life for Plaintiffs and thousands of others in the metropolitan area.

### D.     **The Named Plaintiffs' Imprisonment**

82.     Defendant's policies and practices in collecting unpaid fines, fees, costs, and surcharges relating to traffic tickets and other minor offenses, for at least the past five years, caused and exemplifies the violations of the named Plaintiffs' fundamental constitutional rights.

83.    **i.    Quinton M. Thomas**

84.    Quinton Thomas is a 30-year-old man who resides in St. Louis, Missouri.  He is African-American.

85.    Mr. Thomas has been jailed in the St. Ann Jail at least three times on warrants issued by Normandy and Edmundson, among other municipalities.  The warrants initially stemmed from minor, driving-related offenses, such as running a stop sign, no proof of insurance, and improper vehicle registration.

86.    In 2012, officers of the Normandy Police Department stopped Mr. Thomas for invalid license plates and failure to register his vehicle.  The officers issued Mr. Thomas citations for these violations totaling $600.

87.    Mr. Thomas could not afford to pay the $600 fine.  Mr. Thomas appeared at the Normandy Municipal Court and explained to the municipal court judge that he could not afford to pay the $600 fine.

88.    The municipal court judge responded that if Mr. Thomas did not pay at least $100, Normandy would issue a warrant for his arrest.  Mr. Thomas responded that he could not afford to pay $100.  He asked whether he could pay $50 instead, and the judge stated that he could not.  Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for him.

89.    Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay even $100 of the fine.

90.    The municipal court judge, apparently indifferent to Mr. Thomas' pleas of indigence, later issued a warrant for his arrest based on Mr. Thomas' failure to pay $100.

91.     In 2014, Mr. Thomas was driving to work and was stopped by officers of the Edmundson Police Department for allegedly failing to make a complete stop at a stop sign.  Mr. Thomas denies running the stop sign.  The officers informed Mr. Thomas that he had outstanding warrants in Normandy, Pine Lawn and St. John, among others.  The Edmundson police officers took Mr. Thomas to the St. Ann Jail.

92.     Officers at the St. Ann Jail informed Mr. Thomas that he could be released if he paid a $150 bond.  There was no bail hearing.  Mr. Thomas could not afford to make this payment and thus was unable to secure his release.  The St. Ann Jail held Mr. Thomas for three days on behalf of Normandy and Edmundson.

93.     The conditions in the St. Ann Jail were terrible.  The jail cells were packed four people to a cell.  The cells were so filthy that Mr. Thomas did not want to make contact with the walls or even the mattresses, which appeared not to have been cleaned in years.  Jail officers provided Mr. Thomas (and other inmates) with a used blanket, but nothing else to separate himself from the disgusting and unsanitary mattress.

94.     The food in the St. Ann Jail was unhealthy and nearly inedible.  Every meal consisted of a bologna sandwich (with greenish meat and hard bread), applesauce, and black coffee.

95.     After three days, the St. Ann Jail "released" Mr. Thomas, and officers from the City of St. John transported Mr. Thomas to the St. John Police Department.

96.     The St. John Police told Mr. Thomas that he had an outstanding warrant for an allegedly-unpaid parking ticket in St. John, information of which Mr. Thomas was previously unaware.  Officers further informed him that, because of additional late fees and fines that had accumulated over time, the amount owed had ballooned from approximately $100 to almost $500.

97.     Police officers in St. John informed Mr. Thomas that they were going to take him to the St. Louis County Justice Center in Clayton unless he could make a payment of at least $120. There was no bail hearing.  Mr. Thomas contacted his father, who was able to pay the $120 bond to secure Mr. Thomas' release from St. John.

98.     Shortly after his release, Mr. Thomas appeared at the Edmundson Municipal Court and explained to the municipal court judge that he could not afford to pay the $300 citation for running a stop sign.

99.     The municipal court judge was indifferent to Mr. Thomas' pleas of indigence and directed Mr. Thomas to see the municipal court clerk to set up a payment plan.  The payment plan, however, only worsened Mr. Thomas' situation—it included additional fees and costs and exorbitant interest rates, resulting in monthly payments that Mr. Thomas could not afford.

100.    Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for Mr. Thomas.

101.    Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay the fine.

102.    A key reason Mr. Thomas could not afford to make the monthly payments required by the payment plan was that he had outstanding (and continually compounding) fines and court costs stemming from tickets for traffic and other minor violations in several other municipalities, including St. Charles, St. John, and Normandy.

103.    Mr. Thomas missed a monthly payment because he could not afford to make the payment.  Because Mr. Thomas could not afford to make the monthly payments, Edmundson issued a warrant for his arrest for "Failure to Pay" and/or "Failure to Appear."

104.     As a result of the traffic tickets—only one of which resulted from an alleged moving violation—and warrants issued by Edmundson and Normandy, Mr. Thomas' license was suspended in 2013, causing Mr. Thomas to lose his trucking job (which required a commercial driver's license).

105.     In January 2015, officers of the Dellwood Police Department responded to complaints of a domestic disturbance at Mr. Thomas' home stemming from a verbal argument between Mr. Thomas and his girlfriend.  The officers ran Mr. Thomas' and his girlfriend's names and discovered that both had outstanding warrants for unpaid traffic tickets.  Notably, Dellwood did not issue any charges and did not make any arrests in connection with the domestic disturbance complaint.

106.     The officers arrested Mr. Thomas and took him to the St. Louis County Justice Center in Clayton on outstanding warrants for unpaid traffic tickets.  At the Justice Center, jail officers informed Mr. Thomas that they would release him if he paid a bond.  There was no bail hearing.  Mr. Thomas could not afford to make this payment and thus was unable to secure his release. Mr. Thomas was held in Clayton for approximately three days.

107.     After approximately three days, officers at the Justice Center transferred Mr. Thomas to the St. Ann Jail, which held him on behalf of Normandy and Edmundson, among other municipalities, for the outstanding warrants described above.  Officers at the St. Ann Jail informed Mr. Thomas that they would release him if he paid a bond.  There was no bail hearing.  Mr. Thomas was once again unable to pay a bond to secure his release from St. Ann.

108.     As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

109.    After at least one day in the St. Ann Jail, officers at the St. Ann Jail transferred Mr. Thomas to the O'Fallon Jail.

110.    Officers at the O'Fallon Jail informed Mr. Thomas that his bond to secure his release was $340.  There was no bail hearing.  Mr. Thomas was able to scrounge together enough money from family and friends to pay a $340 bond to O'Fallon in order to secure his release.

111.    In May 2016, officers of the Beverly Hills Police Department stopped Mr. Thomas for a broken bumper. The officers informed Mr. Thomas that he had outstanding warrants in Normandy and Edmundson, among others, and took Mr. Thomas to the Beverly Hills Police Department.   The officers detained Mr. Thomas at the Beverly Hills Police Department for approximately one hour.

112.    The officers told Mr. Thomas that he would need to pay $300 "to get out."  There was no bail hearing.  Mr. Thomas was unable to pay that bond amount.

113.    While Mr. Thomas was detained at the Beverly Hills Police Department, the officers refused to allow any of Mr. Thomas' friends or family to retrieve the car.  As a result, Mr. Thomas' car was sent to impound.  Mr. Thomas could not afford to get the car out of impound and consequently lost his car permanently.

114.    Officers from the St. Ann Police Department picked Mr. Thomas up from the Beverly Hills Police Department and took him to the St. Ann Jail on behalf of Normandy and Edmundson (in connection with warrants for unpaid traffic tickets and "Failure to Pay" and/or "Failure to Appear" charges, as described above).

115.    As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

116.    Mr. Thomas was held in the St. Ann Jail for a day and a half.  Mr. Thomas missed a day of work at his construction job because he was incarcerated.  As a result of missing work due to his incarceration for failure to pay fines and costs from minor, traffic-related offenses, Mr. Thomas was fired from his construction job.

**ii.    Bradley Jiles**

117.    Bradley Jiles is a 26-year-old African American man.

118.    Mr. Jiles has been jailed more than ten times in the last five years in connection with alleged municipal ordinance violations.  Over the span of approximately one year — from the summer of 2014 to the spring of 2015 — Mr. Jiles was jailed on four separate occasions in connection with unpaid fines for traffic and other minor violations.

119.    Particularly, in June 2015, Mr. Jiles was driving to court after work to obtain a replacement title for his car after the original title had been damaged in the rain.  He was driving within the speed limit and was pulled over.  When Mr. Jiles inquired as to why, the officer told him that he was unregistered, had been speeding, and looked suspicious.  The officer said to Mr. Jiles, "I could be an asshole and give you all these tickets because of your attitude."  The officer cited Mr. Jiles for failure to register, improper vehicle registration, and expired license.

120.    Mr. Jiles was arrested and spent two days in St. Louis County Justice Center.  The holding cell was covered with old gum and graffiti.  Mr. Jiles pled guilty and was sentenced to two days of time served.

121.    Officers at the Justice Center then transported Mr. Jiles to the Hazelwood Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket for driving with an expired license.

122.    After 24 to 48 hours, the Hazelwood Jail "released" Mr. Jiles and transported him to the St. Ann Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket in Edmundson for driving with invalid license plates.

123.    Officers at the St. Ann Jail told Mr. Jiles that he could secure his release if he paid several hundred dollars in bond to Edmundson (based on outstanding fines for traffic and other minor violations).  There was no bail hearing.

124.    Mr. Jiles could not afford to pay the bond to secure his release.  As a result, the St. Ann Jail held Mr. Jiles for at least three days.  While he was in the St. Ann Jail, Mr. Jiles repeatedly asked how long he would be held, but was told nothing.

125.    Finally, one of the St. Ann Jail officers noticed in Mr. Jiles's file that Mr. Jiles should have been released.  The St. Ann Jail released Mr. Jiles later that day.

126.    Mr. Jiles lost income because of the amount of time he spent in jail, all for what amounted to routine, unjustified, or discriminatory traffic stops and minor municipal violations.

**E.**    **Class Allegations**

127.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

128.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendant's unlawful debt-collection scheme.

129.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

130.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

131.    Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.

132.    The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the Defendant from fines, fees, costs, or surcharges arising from cases in the Defendant's courts.

133.    The Damages Class is defined as: All persons who, from December 12, 2013 until the present, were held in jail by or on behalf of Defendant because of the persons' non-payment of a monetary sum required by Defendant or a neighboring municipality as a result of the individuals' inability to pay.

**1.     Numerosity.  Fed. R. Civ. P. 23(a)(1)**

134.    Over the past five years, thousands of people have owed and currently owe Defendant or neighboring municipalities money from old traffic tickets and other minor municipal offenses.  Pursuant to Defendant's policies and practices, Defendant has placed thousands of people, who have indicated that they are too poor to pay their debts in total, on payment plans that are arbitrary, exorbitant, and inconsistent with the debtors' ability to pay.  All of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency purportedly required by Defendant.

135.    Defendant has kept hundreds of people in jail for non-payment in each of the past five years.  Defendant retains, and is required by law to retain, records of these instances.

136.    Pursuant to Defendant's policies and practices, those kept in jail by Defendant for non-payment did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law.  Pursuant to Defendant's policies, Defendant made no determinations of indigence, ability to pay hearings, or evaluations of alternatives to incarceration, and Defendant

provided none of the relevant state and federal protections for debtors.  Nor were those jailed by Defendant provided adequate counsel to represent them.

137.    Those who still owe Defendant debt payments or who will incur such debts likely will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**2.    Commonality.  Fed. R. Civ. P. 23(a)(2).**

138.    The relief sought is common to all members of the Injunctive and Damages Classes, and common questions of law and fact exist as to all members of the Classes.  The Plaintiffs seek relief concerning whether Defendant's policies, practices, and procedures violated their rights and relief mandating Defendant to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

139.    Among the most important, but not the only, common questions of fact are:

a.    Whether Defendant has had a policy and practice of keeping people in jail who owe money on old judgments unless and until they can pay a monetary sum;

b.    Whether Defendant has had a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before jailing the person for non-payment;

c.    Whether Defendant has provided notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether Defendant makes findings concerning ability to pay and alternatives to incarceration;

d.    Whether Defendant has provided adequate legal representation to those jailed for unpaid debts in proceedings that result in their incarceration;

e.    Whether Defendant's employees and agents have had a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;

> f.   Whether Defendant has had a policy and practice of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;
>
> g.   Whether Defendant has sought to extort funds from poor residents of the St. Louis area by ensnaring them in an escalating spiral of indebtedness and imprisonment; and
>
> h.   Whether Defendant's policies and practices discriminated on the basis of race or other impermissible factors.

140.   Among the most important common question of law are:

> a.   Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;
>
> b.   Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by Defendant for non-payment of debts;
>
> c.   Whether people who cannot afford to pay Defendant are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;
>
> d.   Whether people are entitled to adequate legal representation in debt-collection proceedings initiated and litigated by Defendant prosecutors that result in their incarceration if they cannot afford an attorney;
>
> e.   Whether Defendant may jail, threaten to jail, and use other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay Defendant in full; and
>
> f.   Whether Defendant may arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt.

**3.   Typicality.  Fed. R. Civ. P. 23(a)(3).**

141.   The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interests in this case as all other members of

the Classes that they represent.  Each of them suffered injuries from the failure of Defendant to comply with the basic constitutional provisions detailed below.  The answer to whether Defendant's policies and practices ae unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

142.    If the named Plaintiffs succeed in their claims that the Defendant's policies and practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

**4.    Adequacy.  Fed. R. Civ. P. 23(a)(4).**

143.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

144.    Plaintiffs are represented by attorneys from Arnold & Porter LLP, a firm with experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendant's scheme and the relevant constitutional and statutory law.  Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system through their representation of numerous impoverished people in the St. Louis area.[16]

---

[16] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving municipalities in the St. Louis region for the past five years and is an expert on the ways in which Defendant's illegal practices and policies make and keep people poor.  ArchCity Defenders has recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action

145. The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, Defendant's employees, Defendant's jail inmates, families, attorneys practicing in the Defendant's Municipal Courts, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

146. Counsel have also observed numerous courtroom hearings in St. Ann and other municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

147. As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the Defendant's scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel also have developed relationships with many of the individuals and families most victimized by Defendant's practices.

148. The interests of the members of the Class will be fairly and adequately protected

---

suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. *See Templeton v. Dotson,* 4:14-cv-01019; *Jenkins et al. v. City of Jennings,* 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016). ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014. The report is available at http://www.archcitydefenders.org.

by the Plaintiffs and their attorneys.

     **5.**      **Rule 23(b)(2)**

     149.    Class action status is appropriate because Defendant, through its policies, practices, and procedures that make up its traffic and ordinance debt-collection scheme, has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Classes.

     150.    A declaration that Defendant cannot jail people solely because they cannot afford to make a monetary payment will apply to each Class member.

     151.    Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by Defendant for non-payment will apply to each Class member.

     152.    The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by Defendant's prosecutors in connection with which they are jailed; that the Defendant cannot imprison Class members for debts; that the Defendant cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; and that the Defendant cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty.

     153.    Injunctive relief compelling Defendant to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the Defendant's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct.  Therefore, declaratory

and injunctive relief with respect to the Class as a whole is appropriate.

### 6. Rule 23(b)(3)

154.     Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.  This case turns, for every Plaintiff, on what the Defendant's policies and practices are and on whether those policies are lawful.

155.     The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendant's policies and practices than individual suits by hundreds or thousands of individuals arrested and detained by Defendant.  The question of damages will also be driven by class-wide determinations.

156.     To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.  If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Fourteenth Amendment—Imprisonment For Inability To Pay

157.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

158.    The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution prohibit imprisoning a person for failure to pay money owed to the government if that person is indigent and unable to pay.

159.    Defendant, through its police department, municipal court system, and city prosecuting attorneys' office, imprisoned and/or threatened to imprison each of the Plaintiffs when they could not afford to pay debts allegedly owed for traffic and other minor offenses without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment, as required by the United States Constitution.  At any moment, a person with financial resources in the Plaintiffs' positions could have paid a sum of cash and been released from jail.

160.    Defendant maintained a policy and practice of (i) imprisoning, or threatening to imprison, people, including Plaintiffs, when they cannot afford to pay the debts allegedly owed from traffic and other minor offenses, (ii) directing its police officers to issue fine-laden citations for minor infractions in an effort to raise city revenues, (iii) encouraging the prosecution and incarceration of indigent Plaintiffs who were unable to pay fines, and (iv) keeping people, including Plaintiffs, in jail unless and until they are able to pay arbitrarily determined (and constantly shifting) sums of money.

161.    Defendant's actions violated Plaintiffs' rights, and the rights of others similarly situated, under the Fourteenth Amendment to the United States Constitution.  Defendant is liable under 42 U.S.C. § 1983.

162.    As a direct result of Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**COUNT II**
**Violation of the Sixth and Fourteenth Amendments—Failure to Provide Adequate Counsel**

163.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

164.    Defendant, through its police department, municipal court system, and city prosecuting attorneys' office, violated Plaintiffs' rights, and the rights of others similarly situated, to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.  Plaintiffs, and others similarly situated, have been imprisoned by Defendant in connection with debt-collection proceedings in which those people jailed are not afforded counsel.

165.    Defendant's policy and practice of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned for unpaid debts (which are, in turn, based on payment plans arising from traffic and other violations at which the jailed individuals also were unrepresented), violates the Sixth and Fourteenth Amendments to the United States Constitution. Defendant is liable under 42 U.S.C. § 1983.

166.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**COUNT III**
**Violation of the Fourteenth Amendment—Indefinite and Arbitrary Detention**

167.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

168.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits incarcerating people indefinitely and without adequate procedural protections.    Defendant, through its police department, municipal court system, and city

prosecuting attorneys' office, has engaged in a policy and practice of jailing the Plaintiffs and others similarly situated without any meaningful legal process through which they can challenge their detention by keeping them confined in Defendant's jail unless and until they can make arbitrarily and inconsistently established cash payments, in violation of the Fourteenth Amendment.  Defendant is liable under 42 U.S.C. § 1983.

169.    As a direct result of Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**COUNT IV**
**Violation of the Fourth and Fourteenth Amendments—Issuance of Invalid Warrants**

170.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

171.    Defendant's policy and practice, which it implements through its through its police department, municipal court system, and city prosecuting attorneys' office, has been to issue and serve arrest warrants against those who have not paid their debt from old judgments in traffic and other minor cases.  These warrants have been sought, issued, and served without any inquiry into the person's ability to pay even when Defendant has had prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses.

172.    These warrants have been regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense.  Defendant chooses to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court.

173.    Defendant has enforced a policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants but refusing to remove warrants for indigent

individuals who cannot afford legal representation.  Moreover, Defendant's policy and practice of not presenting arrestees in court or unreasonably delaying presentment for days or weeks for no legitimate reason is unlawful.

174.    These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.  Defendant is liable under 42 U.S.C. § 1983.

175.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT V
### Violation of the Fourteenth Amendment—Threats of Incarceration to Collect Debts

176.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

177.    The United States Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.

178.    By incarcerating the Plaintiffs and threatening to incarcerate them, Defendant, acting through its police department, municipal court system, and city prosecuting attorneys' office, takes advantage of its  control over the machinery of the penal and police systems to deny debtors the statutory protections that every other debtor may invoke against a private creditor. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.  Defendant is liable under 42 U.S.C. § 1983.

179.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

a.    Certification of the Declaratory and Injunctive Class and Subclasses and the Damages Class, as defined above;

b.    A declaratory judgment that Defendant has violated Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them for their inability to pay a debt without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

c.    A declaratory judgment that Defendant has violated Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

d.    A declaratory judgment that Defendant has violated Plaintiffs' constitutional rights by holding them indefinitely and arbitrarily in jail independent of any valid legal process;

e.    A declaratory judgment that Defendant has violated Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to Defendant;

f.    An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs and others similarly situated;

g.    A declaratory judgment that Defendant violated Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

h.    A judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of Defendant's unconstitutional and unlawful conduct; and

     i.       An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Dated: December 12, 2018

Respectfully submitted,
**ArchCity Defenders, Inc.**

By:    /s/ John M. Waldron
     Blake A. Strode  (MBE #68422MO)
     Michael John Voss (MBE #61742MO)
     Sima Atri (MBE #70489)
     John M. Waldron (MBE #70401MO)
     440 North 4th St., #390
     Saint Louis, MO 63102
     855-724-2489 ext. 1021
     314-925-1307 (fax)
     bstrode@archcitydefenders.org
     mjvoss@archcitydefenders.org
     satri@archcitydefenders.org
     jwaldron@archcitydefenders.org

     *Attorneys for Plaintiff*

     S. Zachary Fayne (*pro hac vice* motion to be filed)
     ARNOLD & PORTER KAYE SCHOLER LLP
     Three Embarcadero Center, 10th Floor
     San Francisco, CA 94111
     Tel:  (415) 471-3114
     Fax:  (415) 471-3400
     Zachary.Fayne@aarnoldporter.com

     Robert Weiner (*pro hac vice* motion to be filed)
     David B. Bergman (*pro hac vice* motion to be filed)
     Seth J. Wiener (*pro hac vice* motion to be filed)
     John Robinson (*pro hac vice* motion to be filed)
     ARNOLD & PORTER KAYE SCHOLER LLP
     601 Massachusetts Ave., N.W.
     Washington, D.C. 20001
     Tel:  (202) 942-5000
     Fax:  (202 942-5999
     Robert.Weiner@arnoldporter.com
     David.Bergman@arnoldporter.com
     Seth.Wiener@arnoldporter.com

John.Robinson@arnoldporter.com

*Attorneys for Plaintiffs*